Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HOTEL, MOTEL AND CLUB EMPLOYEES' UNION LOCAL 568, AFL–CIO, Respondent.

Civ. A. No. 34104.

United States District Court
E. D. Pennsylvania.

Oct. 21, 1963.

On Motion to Modify Nov. 14, 1963.

H. Dawson Penniman and William J. Davis, Philadelphia, Pa., for petitioner.

Alan R. Howe, Philadelphia, Pa., for Edward Davis, respondent.

FREEDMAN, District Judge.

Petitioner, the Regional Director of the Fourth Region of the National Labor Relations Board seeks a temporary injunction pursuant to § 10(l) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(l)),[1] on a charge filed by Restaurant Management, Inc. (RMI), the operator of a restaurant known as "Singing Waters", situated in the Penn Center Motor Inn, 20th & Market Streets, Philadelphia. The petition alleges that respondent, an unincorporated labor organization, is engaging in an unfair labor practice within the meaning of § 8(b) (7) (C) of the Act (29 U.S.C.A. § 158(b) (7) (C))[2]. A full hearing has been held and much testimony has been presented on both sides.

It is conceded by the Union that the restaurant meets the NLRB's jurisdictional standard of $500,000 in annual gross receipts. There is no question that a sufficient quantity of goods and materials flows to the restaurant from outside the State to establish the requisite effect on interstate commerce.

I am not called upon for a definitive decision on the merits of the case. My function is the more narrow one of deciding whether there is reasonable cause to believe that the unfair labor practice charged has been committed. The standard to be applied has been authoritatively defined in Schauffler v. Local 1291, 292 F.2d 182, 187 (3d Cir. 1961): "The Board need not show that an unfair labor practice has been committed, but need only demonstrate that there is reasonable cause to believe that the elements of an unfair labor practice are present. Nor need the Board conclusively show

1. "Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of * * * section 158(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith * * *. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law * * *."

2. "It shall be an unfair labor practice for a labor organization or its agents—
    *     *     *     *     *
   "(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
    *     *     *     *     *
   "(C) where such picketing has been conducted without a petition under section 159(c) of this title being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing: *Provided*, That when such a petition has been filed the Board shall forthwith, without regard to the provisions of section 159 (c) (1) of this title or the absence of a showing of a substantial interest on the part of the labor organization, direct an election in such unit as the Board finds to be appropriate and shall certify the results thereof: *Provided further*, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course of his employment, not to pick up, deliver or transport any goods or not to perform any services.
   "Nothing in this paragraph (7) shall be construed to permit any act which would otherwise be an unfair labor practice under this subsection."

the validity of the propositions of law underlying its charge; it is required to demonstrate merely that the propositions of law which it has applied to the charge are substantial and not frivolous. * * *"

On July 6, 1963, shortly before the formal opening of the restaurant, the Union commenced picketing at the front entrance on Market Street. From the time the picketing began until July 31st the pickets' signs read as follows:

"To the Public

SINGING WATERS

does NOT have a

LABOR
AGREEMENT

with

Hotel, Motel & Club
Employees Union
Local 568 — AFL–CIO"

After July 31st picketing was extended to Commerce Street, at the rear of the restaurant, and the signs were changed to read as follows:

"Singing Waters

Employees

on

STRIKE

We request your cooperation

Hotel, Motel & Club
Employees Union

LOCAL 568  AFL–CIO"

I have no doubt from the evidence that the conduct of the Union from the very beginning, even when it used the "informational" signs, was intended, among other things, to achieve the unionization of "Singing Waters'" employees. Two Union organizers visited the restaurant in June, before it opened, seeking a labor agreement and Union representation. The Union leaders attended two meetings with management and brought along copies of an existing labor contract. They were willing to halt picketing during negotiations. Organizational activity took place throughout the period in question in the form of solicitation of union cards among the employees.

██ There is strong evidence that both before and after July 31st the Union was engaged in an attempt to organize and to obtain a collective bargaining agreement from the management of "Singing Waters", notwithstanding its formal disclaimer of any such intention because it did not represent a majority. There is therefore reasonable cause to believe that at least *an* object of the picketing was recognitional both before and after July 31st. The picketing prior to July 31st, however, is protected by the second proviso of § 8(b) (7) (C) as lawful "informational" picketing because the signs then used were, in the language of § 8(b) (7) (C), "for the purpose of truthfully advising the public (including consumers) that an employer does not * * * have a contract with, a labor organization * * *." Moreover, the picketing during this period, aside from a few isolated instances, did not have the effect of inducing delivery stoppages. The proviso, therefore, fully applies to the picketing prior to July 31st. It is true that even informational picketing ordinarily carries with it some coercive effect. But it is clear that the Congressional purpose was to permit such activity unless it reaches the more direct consequence of stoppage of deliveries or services.[3]

██ A decisive change in the Union's activities occurred on July 31st when new signs which proclaimed a strike were adopted. The language of the new signs did not purport to advise the public that the restaurant was non-union. Instead, the signs were admittedly a signal to other unionized drivers and employees not to cross the picket line. Substantial delivery stoppages did, in fact, result. The Union seeks to justify the change to "strike"-sign picketing on the ground

3. See Barker Bros. Corp., 138 NLRB 479, 487–88; Cox, "The Landrum-Griffin Amendments to the National Labor Relations Act," 44 Minn.L.Rev. 257, 262–70 (1959).

that several employees had been dismissed because of Union activity. It claims that the picketing from then on was outside the scope of § 8(b) (7) because it was purely protest picketing and not recognitional or organizational. I find reasonable cause to believe that the predominant motive for the strike picketing was to coerce the management of "Singing Waters" to recognize the Union as the collective bargaining agent for its employees even though the Union did not represent a majority of them. The Union never communicated with management regarding the dismissed employees. As soon as it received word of the discharges it sent the new recruits to the picket lines and had the signs changed from informational to strike notices. It can fairly be found as a fact, and there is therefore reasonable cause to believe, that the dismissal of the few employees was eagerly seized upon by the Union as a pretext for more effective picketing to coerce recognition of the Union.

The Board has submitted a series of suggested Findings of Fact and Conclusions of Law. I shall consider them Requests for Findings of Fact and Conclusions of Law. I affirm Requests for Findings of Fact Nos. 1 (as amended to describe the petitioner as Regional Director), 2, 3, 4(a), (b), (c), (d), (e), (f), (g), (h) (except that during the pendency of these proceedings all picketing has by agreement between the parties been suspended), (i), (j) (except that I limit this to the period after July 31st), (k), (*l*), and 5.

I affirm petitioner's Requests for Conclusions of Law Nos. 1, 2(a), (b), and (c). I decline petitioner's Request for Conclusion of Law No. 3.

In the circumstances of this case the Union should be enjoined from picketing other than informational picketing of the kind which was carried out prior to July 31st. I will permit such informational picketing on Market Street, where it will not induce stoppage of deliveries, and on Commerce Street on condition that it shall cease there if it induces stoppage of deliveries or services.

### ORDER

And now, October 21, 1963, the respondent, Hotel, Motel and Club Employees' Union Local 568, AFL–CIO, its officers, representatives, agents, servants, employees and all members and persons acting in concert or participating with it or them, are hereby temporarily enjoined and restrained pending final disposition by the National Labor Relations Board of the charge against the Union, from picketing the premises of "Singing Waters" restaurant at 20th and Market Streets, Philadelphia, Pennsylvania, in any manner other than to truthfully advise the public that the employer does not employ members of, or have a contract with, a labor organization. Such informational picketing may be conducted on the Market Street side of the restaurant premises; and also on the Commerce Street side of the restaurant premises, on condition that it shall immediately cease if it should interfere with deliveries or the performance of services for the restaurant by third parties or employees of third parties.

### On Motion to Modify

On October 21, 1963, I filed an Opinion and entered an Order pursuant thereto temporarily enjoining the respondent Union, pending final disposition by the National Labor Relations Board of the charge against the Union, from picketing the premises of "Singing Waters" restaurant at 20th & Market Streets, Philadelphia, Pennsylvania, "in any manner other than to truthfully advise the public that the employer does not employ members of, or have a contract with, a labor organization." There is no complaint regarding this portion of the Order.

Petitioner has filed a motion to modify or amend the subsequent provision of the Order, which reads as follows: "Such informational picketing may be conducted on the Market Street side of the restaurant premises; and also on the Commerce Street side of the res-

taurant premises, on condition that it shall immediately cease if it should interfere with deliveries or the performance of services for the restaurant by third parties." At a hearing held yesterday each side produced evidence on the question of interference with deliveries to the restaurant by third parties or their employees.

Since the entry of the Order on October 21, 1963, there have been repeated failures by third parties or their employees to deliver food and supplies which were required in the "Singing Waters" restaurant. The restaurant was able to obtain these items only by having them unloaded by its dishwashers and kitchen stewards. In the case of linen supplies the deliveries had to be made by the supplier's executive personnel rather than its regular employees and this resulted in irregularity in the time and quantity of the deliveries.

The refusal by drivers to make deliveries contradicts the testimony presented to me by the Union prior to the entry of the Order of October 21, 1963, that informational picket signs—unlike strike signs—would not interfere with deliveries.

It is true that the interferences which have occurred have been dealt with more or less successfully by the restaurant. However, the resultant inconvenience and inefficiency in the restaurant's operations is more than de minimis. Moreover, the delivery stoppages have not been merely accidental or sporadic but, on the contrary, have been and can be expected to be repeated regularly.

For these reasons I conclude that since informational picketing was permitted on Commerce Street solely on condition that it should immediately cease if it interfered with deliveries, the right to continue with such informational picketing has now ended.

### ORDER

And now, November 14, 1963, the condition to the right of the Union to conduct informational picketing on the Commerce Street side of the "Singing Waters" restaurant provided in the Order of October 21, 1963, having been violated, the authorization for the conduct of informational picketing by the respondent Union on the Commerce Street side of the restaurant premises is hereby terminated; and the Order of October 21, 1963, is hereby modified, effective this date, by striking therefrom the following language: "and also on the Commerce Street side of the restaurant premises, on condition that it shall immediately cease if it should interfere with deliveries or the performance of services for the restaurant by third parties or employees of third parties".